UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY SCOTT HAMMOND,

       Plaintiff,

CASE NO. 04-73410
HON. LAWRENCE P. ZATKOFF

v.

ETHAN SMITH,
DAN HEYNS, in his official capacity only, as
SHERIFF OF JACKSON COUNTY, and
THE COUNTY OF JACKSON,
a Municipal Corporation,

       Defendants.

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on October 4, 2005

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I.  INTRODUCTION**

This matter is before the Court on Defendants' Motion for Summary Judgment filed on July 8, 2005. Plaintiff has responded to Defendants' motion, and Defendants have replied to the response. The Court finds that the facts and legal arguments are adequately presented in the parties' papers and the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. MICH. LR 7.1(e)(2), it is hereby ORDERED that the motion be resolved on the

briefs submitted. For the reasons set forth below, Defendants' Motion for Summary Judgment is GRANTED.

## II. BACKGROUND

On September 14, 2002 at approximately 11:30 a.m., Jackson County Central Dispatch received an anonymous call claiming that an individual at 2718 Page Avenue was outside yelling and throwing things. Plaintiff states that at that time he was tearing down a fence, and had a hammer, pry bar, and U-bolt in his hands. Hammond Dep. at 70. Defendant Smith, a deputy of the Jackson County Sheriff's Department, arrived at the scene in response to the Dispatch call.

The four individuals who witnessed some or all of the following events are Plaintiff, Deputy Smith, Robert Comeau (a neighbor), and Anna Smith (another neighbor). Each gives a slightly different version of events.

### A.     Deputy Smith's Version of Events

Deputy Smith claims that within seconds of his arrival, Plaintiff began moving towards him at a "fast pace" while he was still seated in the squad car. Plaintiff then threw a U-bolt through the driver's side of the windshield.[1] Smith avoided being struck by leaning to the right. Smith claims that Plaintiff then threw a hammer that shattered the driver's side window, while Smith was still seated in the car. Ethan Smith Dep. at 18. Smith leaned and turned his head back to avoid the hammer. Photographs show the shattered window, and the hammer lying on the floor of the front passenger's side of the car. Defendants' Exh. 5. Smith then kicked his door open, knocking Plaintiff back. Smith claims that Plaintiff continued to throw items at him. *Id.* at 27. Smith told

---

[1]The mobile recording unit in Smith's squad car was activated as he reached the scene. The tape shows Plaintiff run towards the car as soon as it comes to a halt. Plaintiff then leaves the field of view, and cracks appear on the windshield. Photographs show the U-bolt entered the top of the windshield directly over the steering wheel. Defendants' Exh. 3.

Plaintiff repeatedly to get on the ground, but Plaintiff continued to advance. Smith claims he retreated around the rear of the squad car, and continued moving backwards.

Smith then sprayed Plaintiff with Pepper Spray. *Id.* at 33. Smith claims the Pepper Spray had no effect, and Plaintiff continued to advance. Smith continued moving backwards, and ran into another car, causing him to fall down and land on his hands and knees. *Id.* at. 46. Smith claims he then felt something hit him on the back. He looked up and saw Plaintiff standing over him with a screwdriver. *Id.* at 48. Smith then kicked Plaintiff, knocking him back. Smith claims Plaintiff then charged him with the screwdriver raised, at which point Smith shot him. *Id.* at 50. Approximately 26 seconds lapsed from Smith's arrival until the shooting.

**B.    Plaintiff's Version of Events**

Plaintiff claims that when Deputy Smith arrived, Plaintiff thought Smith was "the devil." Hammond Dep. at 75. Plaintiff admits he threw the U-bolt through the windshield, trying to hit "the devil." Plaintiff also admits to throwing the hammer, but claims it was through the back seat window after Smith exited the car. Plaintiff claims he then started scuffling with Smith, who "maced" him. *Id.* at 80. Plaintiff has given two accounts of the actual shooting. In his deposition, Plaintiff testified as follows: "I was standing there kind of stunned from the mace, and then he – I believe I dropped a screwdriver at that point or the pry bar, and then he stepped back and then he tripped, and he staggered back about eight feet, and then turned and shot me." *Id.* In his interview at the Center for Forensic Psychiatry Plaintiff gave the following account: "I had a body hammer, broke his windows and I was punching him with a pry bar in my hand. I did not realize that I had [it] in my hand. I don't think I was trying to stab him, I was just punching him, trying to kick his butt. The officer turned around and shot me." Defendants' Exh. 14.

3

**C.     Robert Comeau's Version of Events**

Comeau is one of Plaintiff's neighbors. Initially Comeau told the police he had not seen anything, but claimed during his deposition that he had seen part of the incident. He went to his window after he heard glass breaking. He saw Plaintiff walk towards Smith, and Smith retreat. Comeau claims Plaintiff had nothing in his hands. Comeau Dep. at 8. Comeau then saw Smith "mace" Plaintiff. He claims Plaintiff continued to advance on Smith after being "maced." Comeau claims Smith backed up three or four steps, then went into a crouch and fired a "kill shot" to Plaintiff's chest. *Id.* at 9. Comeau claims the entire incident took 26 or 27 seconds.

**D.     Anna Smith's Version of Events**

Ms. Smith is another one of Plaintiff's neighbors. She had heard Plaintiff screaming earlier in the day. Some time later (from 45 minutes to an hour and a half) she heard Plaintiff screaming again and went to the window. She claims she saw Plaintiff and Deputy Smith standing around 60 feet apart. Anna Smith Dep. at 13. Plaintiff was approaching Deputy Smith at a steady pace, and Deputy Smith was backing up. Ms. Smith claims she saw something in Plaintiff's hands. *Id.* at 17. Ms. Smith then told her husband "he's going to get shot" and left the window to go to the door. *Id.* Before she reached the door she heard a gunshot. *Id.* at 22.

**E.     Subsequent Proceedings**

Plaintiff was charged with Assault With Intent to Murder, Assault With a Dangerous Weapon, Assaulting a Police Officer, and Malicious Destruction of Police Property. He was found Not Guilty by Reason of Insanity. On September 1, 2004 Plaintiff brought the current § 1983 suit against Deputy Smith, claiming Smith violated Plaintiff's Fourth Amendment rights. Plaintiff also claims Jackson County and the Jackson County Sheriff, Dan Heyns, are liable for their alleged

failure to train officers on how to arrest a mentally ill person.

### III. LEGAL STANDARD

Summary judgment is appropriate only if the answers to the interrogatories, depositions, admissions, and pleadings combined with the affidavits in support show that no genuine issue as to any material fact remains and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). A genuine issue of material fact exists when there is "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted). In application of this summary judgment standard, the Court must view all materials supplied, including all pleadings, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

The moving party bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record that establish the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324. The non-moving party must do more than show that there is some metaphysical doubt as to the material facts. It must present significant probative evidence in support of its opposition to the motion for summary judgment in order to defeat the motion for summary judgment. *See Moore v. Phillip Morris Co.*, 8 F.3d 335, 339-40 (6th Cir. 1993).

## IV.  ANALYSIS

**A.      Plaintiff's Claim Against Deputy Smith**

Plaintiff claims that Defendant Smith used excessive force when he shot Plaintiff on September 14, 2002. The use of excessive force by police officers may give rise to a claim under 42 U.S.C. § 1983. *See Tennessee v. Garner*, 471 U.S. 1 (1985). The key question is whether the force used was reasonable under the Fourth Amendment. When making this determination, the court must balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The reasonableness of a particular use of force depends on the "facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *see also Patrick v. City of Detroit*, 906 F.2d 1108, 1115 (6th Cir. 1990). The use of force must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The Court must make "allowance for the fact that police officers are often forced to make split second judgments in circumstances that are tense, uncertain and rapidly evolving." *Id.* at 397. Thus, the analysis of an excessive force claim is fact specific, and consideration must be given to the totality of the circumstances surrounding the arrest.

Plaintiff argues that his case contains a disputed issue of material fact that precludes summary judgment. Specifically, Plaintiff claims the disputed issue is whether he was holding a weapon during the altercation with Deputy Smith. Deputy Smith claims Plaintiff was holding a

screwdriver. Ethan Smith Dep. at 18. Ms. Smith claims Plaintiff had "something in his hands." Anna Smith Dep. at 17. Plaintiff admits he was holding a screwdriver or pry bar until shortly before he was shot. Hammond Dep. at 80. On the other hand, Comeau claims Plaintiff had nothing in his hands as he approached Deputy Smith. Comeau Dep. at 8.

However, this disputed issue does not create a genuine issue of material fact. The Supreme Court has held that "the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Comeau's account, which is the most favorable towards Plaintiff, does not preclude summary judgment.

The substantive law is provided by *Garner*, *Graham*, and their progeny. The Garner Court held that a "police officer may not seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 10. The assumption underlying this statement is that an unarmed suspect may still in fact be dangerous. This assumption was reflected throughout the opinion: "the fact that an unarmed suspect has broken into a dwelling at night does not automatically mean he is physically dangerous." *Id.* at 21. Clearly, under certain circumstances an unarmed suspected may be dangerous. For deadly force to be precluded, the suspect must be unarmed *and* nondangerous.

In *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992), the Sixth Circuit held that the use of deadly force against an unarmed suspect was appropriate. In *Freland*, the suspect's vehicle was pursued by a police officer after he ran a stop sign. After a high speed chase, during which he allegedly rammed the police car, he was blocked in a dead-end street. He then managed to maneuver his vehicle around the police car. However, as he drove by a police officer shot and killed him. The plaintiff (the suspect's mother) argued that the use of deadly force was unreasonable, since

7

another roadblock was in place that would have stopped the suspect, and the suspect was not armed. *Id.* at 346.

The Court noted that "the events in question happened very quickly." *Id.* at 347. The Court held that:

> [W]e must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Id.* The Court affirmed the grant of summary judgment for the defendant, noting that the suspect "posed a major threat to the officers manning the roadblock" and "rather than confronting the roadblock, he could have stopped his car and entered one of the neighboring houses, hoping to take hostages. *Id.*

In the current case, all the accounts (including Comeau's) of the altercation between Plaintiff and Deputy Smith demonstrate that Plaintiff posed a threat of serious physical harm to Deputy Smith and others. It is undisputed that Plaintiff threw a U-bolt through Smith's windshield, an assault that could very well have been lethal. Plaintiff has admitted he was trying to hit Smith with the U-bolt. Furthermore, although Plaintiff claims Smith was out of the car when Plaintiff threw the hammer, even under Plaintiff's version Smith was standing beside the door. Thus, it is undisputed that Plaintiff threw a hammer in Smith's vicinity, with enough force to shatter the car window. After these two violent and potentially lethal attacks, Plaintiff ignored Smith's commands, and advanced on him. Even if Plaintiff was empty-handed, as Comeau claims, he still posed a serious threat to Smith. Comeau stated that even after Plaintiff was "maced," he still continued to advance on Smith. Comeau Dep. at 9. If more officers had been present, they might have been able to subdue Plaintiff

without using deadly force. However, Smith was alone, and was facing not just a "possible assailant," but an individual who had moments before violently assaulted him with potentially lethal force. Given these circumstances, it was eminently reasonable for Smith to use deadly force when he did.

Plaintiff's account also demonstrates that it was reasonable for Smith to use deadly force. Plaintiff claims that he halted and dropped the screwdriver or pry bar after being "maced" by Deputy Smith. Hammond Dep. at 80. However, Plaintiff also admits that he had been "scuffling" with Smith, and "punching him with a pry bar in [Plaintiff's] hand." *Id.*, Defendants' Exh. 14. Plaintiff also claims that Smith tripped after "macing" him. Hammond Dep. at 80. Based on the totality of circumstances, it was reasonable for Smith to assume that Plaintiff posed a threat of serious physical harm.

The entire incident took under 30 seconds, and Deputy Smith had to make a split second decision when he tripped. Although Smith had just used Pepper Spray on Plaintiff, Plaintiff could have taken advantage of Smith's fall by attacking him again. This is precisely the type of situation where the Sixth Circuit has held that the Court should "avoid substituting [its] personal notions of proper police procedure for the instantaneous decision of the officer at the scene." *Freland*, 954 F.2d at 347. Smith had to make an instantaneous decision, and all the available information indicated that Plaintiff posed a significant and lethal threat.

The dispatch report indicated Plaintiff was throwing things, and Smith confirmed this with first hand experience. In addition, Plaintiff's behavior did not constitute a harmless nuisance; he threw two heavy objects at Smith with lethal force. In the split second after Smith tripped, he was faced with two possibilities. Plaintiff could escape, in which case he would pose a significant threat

9

to the neighborhood. Alternatively, Plaintiff could once again attack Smith. Based on the totality of circumstances, Smith's use of force was reasonable. Thus, Plaintiff's Fourth Amendment rights were not violated, and his § 1983 claim fails as a matter of law.

**B.     Deputy Smith's Qualified Immunity**

Even if Plaintiff's Fourth Amendment rights were violated, Deputy Smith is entitled to qualified immunity. The Supreme Court has held that "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194; 125 S. Ct. 596, 599 (2004). The qualified immunity analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Applying *Brosseau*, the Sixth Circuit has noted that:

> Although precedent "establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness," that is "not enough" to deny qualified immunity because "the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense."

*Lyons v. City of Xenia*, 417 F.3d 565, 572 (6th Cir. 2005) (citations omitted). Officials can violate a "clearly established" right in two ways: "where the violation was sufficiently 'obvious' under the general standards of constitutional care that the plaintiff need not show 'a body' of 'materially similar' case law, and where the violation is shown by the failure to adhere to a 'particularized' body of precedent that 'squarely governs the case here.'" *Id.* at 579 (citations omitted).

In this case there was no "obvious" violation of a constitutional right. In Lyons, the Sixth Circuit noted that:

> Even accepting all of Lyons' factual allegations as true, there is nothing "obvious" about what Officer Foubert should have done upon entering a house from which a

10

> fellow officer had just placed a distressed call for backup help and in which he could see immediately upon entering that the officer and resident were in close proximity to each other and in the middle of some form of confrontation.

*Id.* Likewise, in the current case there is nothing "obvious" about what Deputy Smith should have done when he was confronted by an individual who had moments before made a potentially lethal assault on him.

Furthermore, there is no precedent that squarely covers the case. Plaintiff relies on three cases: *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996); *Sova v. City of Mt. Pleasant*, 142 F.3d 989 (6th Cir. 1998); and *Roxbury v. Paul*, 838 F. Supp. 1204 (W.D. Mich. 1992). However, there are substantial differences between those cases and the current case.

In *Dickerson*, officers responded to a dispatcher's report of shots fired. There were conflicting versions of what happened after they arrived; according to one witness a man walked slowly to the front door with his hands by his sides, and before he opened the door he was shot by the police. *Dickerson*, 101 F.3d at 1155. The court held that summary judgment was inappropriate because "it is not clear when the officers began to shoot, whether Dickerson pointed his gun at McClellan before the officers shot him, and whether a warning was feasible." *Id.* at 1164. In the current case, it is undisputed that Plaintiff had violently assaulted Smith by trying to hit him with the U-bolt, and by throwing a hammer in his vicinity with enough force to shatter the car window. Furthermore, Plaintiff ignored Smith's orders to get on the ground.

In *Sova*, the plaintiffs' son, Thomas, was shot and killed by police officers. Thomas had been threatening to kill himself with knives. The officers claimed that Thomas had threatened to get a gun, and charged at them through the kitchen door with knives drawn. *Sova*, 142 F.3d at 902. Plaintiffs claimed Thomas had said nothing about a gun, and was shot even before he stepped out

of the kitchen doorframe. *Id.* Thus, there was an issue of fact regarding whether Thomas posed a threat to the officers. In contrast, Plaintiff in the current case indisputably launched a direct, violent attack on Deputy Smith. Thus, there was a reasonable basis for Smith's actions not present in *Sova*.

In *Roxbury*, three Michigan state troopers were dispatched to investigate shots fired. Arriving at the scene, they shot and killed an individual with a rifle. The Plaintiff claimed the decedent was not pointing the rifle at the troopers, and had been killed without warning. The court held that:

> If the shooting transpired as alleged by the defendants, they would be entitled to qualified immunity. If, however, plaintiff's description of the facts is accepted, then the shooting was unreasonable and qualified immunity should not attach. When the legal question of qualified immunity is completely dependent upon which view of the facts is accepted by the jury, summary judgment is inappropriate

*Roxbury*, F. Supp. 838 at 1207. The current case is markedly different: as noted above, no matter which version of events is accepted, Deputy Smith had a reasonable basis for using deadly force against Plaintiff.

Since Smith's actions did not obviously violate a clearly established constitutional right, and there is no precedent squarely governing the case, Smith is entitled to qualified immunity.

**C.    Plaintiff's Claims Against Dan Heyns and Jackson County**

Plaintiff claims Heyns, in his official capacity as Sheriff, and Jackson County are liable for failing to properly train Deputy Smith. However, a failure to train claim requires an underlying constitutional violation. *Hunt v. Applegate*, No. 95-1062, 1996 U.S. App. LEXIS 34348, *4 (6th Cir. 1996). Since, as discussed above, Plaintiff's Fourth Amendment rights were not violated, neither the Sheriff nor the County can be liable for an alleged failure to train.

Furthermore, even if Plaintiff had a valid claim against Deputy Smith, Plaintiff's claims

against the Sheriff and Jackson County would fail as a matter of law.  To establish a failure to train claim, Plaintiff must show that the "training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989).  A plaintiff can show that the need to train was "'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989).  Alternatively, a plaintiff can show "prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).

Plaintiff alleges that Deputy Smith was not provided any training regarding the arrest of a mentally ill person, and there was a causal link between the lack of training and the shooting: "had Officer Smith been adequately trained, he would have recognized that an emotionally ill person responds to commands differently. . . . It was Officer Smith's inadequate training that did not allow him to recognize the situation and how to adequately arrest or subdue [Plaintiff]." Plaintiff's Response Brief at 22.

However, Plaintiff offers no evidence to support this conclusory statement.  Defendants note that "the brief time frame of the incident and [Plaintiff's] violent and aggressive conduct left Deputy Smith with no chance to reflect on the reason for [Plaintiff's] behavior and no opportunity to consider alternate action based on his mental state." Defendants' Motion for Summary Judgment at 18.  The Court finds Defendants' argument persuasive, especially since Plaintiff has produced no specific evidence demonstrating that the shooting was proximately

13

caused by the alleged failure to train. *See Estate of Sowards v. City of Trenton*, No. 03-2036, 125 Fed. Appx. 31, 41 (6th Cir. 2005) (decedent's death due to own his threatening actions, not the alleged failure to train the police officers to deal with mentally ill persons).

Furthermore, Plaintiff has produced no evidence showing that the alleged failure to train was the result of deliberate indifference. In another case regarding an alleged lack of training regarding mentally ill persons, the Sixth Circuit held that:

> Even if we were to find that the plaintiff had created a genuine issue of material fact as to the adequacy of the county's training, the district court correctly concluded that the plaintiff failed to produce sufficient evidence to create an issue "as to whether Knox County could be deemed to be callous and indifferent to the need for training on the handling of mentally ill inmates." The district court rested its conclusion in part on the fact that no evidence had been presented regarding a pattern of similar violations in the past by the department, nor any evidence that Helton was prone to using excessive force against mentally ill inmates or inmates in general.

*Carey v. Helton*, No. 01-5623, 70 Fed. Appx. 291, 294 (6th Cir. 2003). Similarly, Plaintiff in the current case has produced no evidence of similar incidents regarding mentally ill persons. Thus, Plaintiff's claims against the Sheriff and Jackson County fail as a matter of law.

## V. CONCLUSION

For the above reasons, the Court HEREBY GRANTS Defendants' Motion for Summary

Judgment.  Plaintiff's action is HEREBY DISMISSED with prejudice.

    IT IS SO ORDERED.

                                        s/Lawrence P. Zatkoff
                                        LAWRENCE P. ZATKOFF
                                        UNITED STATES DISTRICT JUDGE

Dated:  October 4, 2005

## CERTIFICATE OF SERVICE

    The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on October 4, 2005.

                                        s/Marie E. Verlinde
                                        Case Manager
                                        (810) 984-3290